UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, et al., | Case No. 1:15-CV-00193-EJL |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. |  |
| UNITED STATES FOREST SERVICE, et al., |  |
| Defendant. |  |

## INTRODUCTION

Pending before the Court in the above-entitled matter are the parties' Cross-Motions for Summary Judgment. The matters have been fully briefed and are ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motions shall be decided on the record before this Court without a hearing.

1

## FACTUAL AND PROCEDURAL BACKGROUND

**1.     The Project**

This matter concerns the United States Forest Service's (Forest Service) approval of the Lost Creek-Boulder Creek Restoration Project (LCBC Project or the Project). (FS077765.) The LCBC Project Area encompasses approximately 80,000 acres of National Forest System lands in the western portion of the New Meadows Ranger District of the Payette National Forest (PNF). (FS077784.) The Project Area is located in Boulder Creek, a tributary to the Little Salmon River, and in the headwaters of the Weiser River and the West Fork of the Weiser River. The proposed activities include 40,000 acres of vegetation treatments – comprised of 22,000 acres of commercial treatments, 18,000 acres of non-commercial treatments, and associated actions such as road maintenance and temporary road construction; 45,000 acres of prescribed fire; watershed improvements; and recreation improvements. (FS077785.) The stated purpose of the Project is to move vegetation and subwatersheds toward desired conditions, manage recreation use, and contribute to the economic vitality of the adjacent communities. (FS077797.)

The Project was developed consistent with the Collaborative Forest Landscape Restoration Program (CFLRP)[1] using a collaborative process between the Payette Forest Coalition (PFC)[2] and the Forest Service. (FS078856.) The PFC met regularly for two

---

[1] In 2009, Congress established CFLRP with the intent of encouraging collaborative, science-based ecosystem restoration of priority forest landscapes. The Weiser-Little Salmon Headwaters area in the PNF was selected as one of the twenty priority landscapes in the nation slated for accelerated restoration. (FS078856.)

[2] The PFC is a coalition of citizen stakeholders representing a broad range of outside interests that was

years beginning in 2009 to develop recommendations for the Project. Those recommendations were then used by the Forest Service to formulate the proposed action. In March of 2014, the Forest Service issued its Final Environmental Impact Statement for the LCBC Project (LCBC FEIS). (FS077765.) The Record of Decision (ROD) was issued in September of 2014 wherein the Forest Service selected Alternative B-modified for implementation. (FS078848, FS078858.)

## 2.    Procedural Background

This action is brought by Plaintiffs, Alliance for the Wild Rockies, Idaho Sporting Congress, and Native Ecosystems Council, who have raised claims under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. (APA), alleging violations of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (ESA), National Environmental Policy Act, 42 U.S.C. § 4331 *et seq*. (NEPA); and the National Forest Management Act, 16 U.S.C. § 1600 *et seq*. (NFMA). (Dkt. 25.) Plaintiffs ask the Court to set aside the Project, enjoin its implementation, and award costs and other expenses incurred in bringing the case. The Forest Service responds that its decisions and approval of the Project satisfies the applicable standards and statutory requirements. (Dkt. 27.)[3] Adams County and the PFC

formed in 2009 to work in partnership with the Forest Service to develop landscape restoration projects within the larger Weiser-Little Salmon Headwaters CFLRP area. (FS078856.)

[3] The named Defendants are the Forest Service; Thomas Kidwell, Chief of the Forest Service; Keith Lannom, Forest Supervisor of the Payette National Forest; and Nora Rasure, Regional Forester for Region 4 of the Forest Service. In this Order, the Court will refer to these named Defendants collectively as either the "Federal Defendants" or the "Forest Service"

have intervened as Defendants in this case. (Dkt. 28, 51, 31.)[4] The parties have each filed Motions for Summary Judgment that have been fully briefed and are ripe for the Court's consideration. (Dkt. 33, 36, 38.) The Court finds as follows.

**STANDARD OF REVIEW**

**1.      Summary Judgment**

Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings" and "designate specific facts" in the record to show a trial is necessary to resolve genuine disputes of material fact. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.

---

[4] The Court will refer to these Defendants individually by name or collectively as the "Intervenor Defendants."

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For summary judgment purposes, an issue must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute...to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat. Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)); *see also British Motor. Car Distrb. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citation omitted).

In considering a motion for summary judgment, the Court does not make findings of fact or determine the credibility of witnesses, *Anderson*, 477 U.S. at 255; rather, it must draw all inferences and view all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

**2.     Administrative Procedure Act**

Judicial review of administrative agency decisions is made under the APA. 5 U.S.C. § 702. Such review is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

APA claims may be resolved via summary judgment pursuant to the standard set forth in Rule 56. *See Nw. Motorcycle Assn. v. United States Dept. of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

The claims in this case raise factual or technical disputes, implicating agency expertise, which are reviewed under the "arbitrary and capricious" standard. *See Price Rd. Neighborhood Assn., Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1508 (9th Cir. 1997) (discussing the two standards governing review of agency actions involving NEPA); *Alaska Wilderness Rec. & Tour. v. Morrison*, 67 F.3d 723 (9th Cir.1995). That standard requires the Court to determine whether the agency action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015) (citations omitted). The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. *Motor Vehicle*, 463 U.S. at 43. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Id.*

(citation omitted); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003)). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations omitted); *see also Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 378 (1989).The court may not overturn an agency decision simply because it disagrees with the decision or with the agency's conclusions about environmental impacts. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citations omitted). The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *Id.* (citation and marks omitted).

When applying this standard, courts grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing certain agency activities. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) (quoting *Nat. Wildlife Fed. v. United States Army Corps of Engrs.*, 384 F.3d 1163, 1174 (9th Cir. 2004) ("Where scientific and technical expertise is necessarily involved in agency decision-making,...a reviewing court must be highly deferential to the judgment of the agency.")). This deference is particularly appropriate where, as here, the Court is reviewing "issues of fact," "where analysis of the relevant documents requires a high level of technical expertise." *City of Sausalito*, 386 F.3d at 1206.

# DISCUSSION

## 1.    Standing

The Intervenor Defendants argue the Plaintiffs lack Article III standing to bring their claims in this case. (Dkt. 39 at 11-15.)[5] Plaintiffs maintain they have standing based on the declarations submitted by members of each of the organizational Plaintiffs. (Dkt. 41.)

Article III of the Constitution limits the power of the federal courts such that they may only adjudicate live "cases" or "controversies." U.S. CONST. ART. III, § 2. The doctrine of standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his [or her] invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citations and quotations omitted). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) (citation omitted). The plaintiff bears the burden of demonstrating that it has standing from the "commencement of the litigation." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002). At the summary-judgment stage, "the plaintiff [cannot] rest on...mere allegations, but must set forth by affidavit or other

---

[5] The Forest Service has not challenged Plaintiffs' standing.

evidence, specific facts" to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation and quotations omitted).

The Plaintiffs in this case have shown that the interests of their members in recreational, preservation, and aesthetic enjoyment of the Project Area are related to each of the respective organizations' purposes and that neither the claims asserted nor the relief requested require the participation of any individual members of the organizations. (Dkt. 25 at ¶¶ 16-19) (Dkt. 33-2, 33-3, 33-4.) The Court must, therefore, determine whether Plaintiffs have shown its members would otherwise have standing to sue in their own right.

For individual members to satisfy Article III's standing requirements, the Plaintiffs must show (1) an "'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant [causation]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision [redressability]." *Friends of the Earth*, 528 U.S. at 180–81 (citing *Lujan*, 504 U.S. at 560–61); *see also WildEarth Guardians v. United States Dept. of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). Additionally, the interests sought to be protected must arguably be within "the zone of interests" protected by the statute in question. *Assn. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153–54 (1970); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485–86 (9th Cir. 2011).

### A.    Injury in Fact

"The 'injury in fact' requirement in environmental cases is satisfied if an individual

adequately shows that [he or] she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that interest is impaired by a defendant's conduct." *Ecological Rights Foundation v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citing cases). "[T]he threshold question of citizen standing...is whether an individual can show that [he or] she has been injured in [his or] her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm." *Id.* at 1151 (standing under the Clean Water Act).

Environmental plaintiffs may satisfy the injury in fact requirement by showing that "they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected" by the challenged decision. *Citizens for Better Forestry v. United States Dept. of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (citations omitted); *see also Ecological Rights*, 230 F.3d at 1149 ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.").

In this case, certain of Plaintiffs' claims, in particular the NEPA claims, raise procedural injuries. (Dkt. 25.) "To satisfy the injury-in-fact requirement of Article III, 'a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his

standing.'" *Center for Bio. Diversity v. United States Fish and Wildlife Serv.*, 807 F.3d 1031, 1043 (9th Cir. 2015) (citations and quotations omitted); *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) ("Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, could protect their concrete interests."). For an environmental interest to be "concrete," there must be a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Kraayenbrink*, 632 F.3d at 485.

Plaintiffs in this case have sufficiently plead an injury in fact. The Second Amended Complaint includes a "Statement of Standing" identifying the basis for Plaintiffs' standing. (Dkt. 25 at ¶¶16-19.) Attached to Plaintiffs' Motion for Summary Judgment are the Declarations of three members who Plaintiffs assert satisfy the standing requirement for each of the named organizational Plaintiffs. (Dkt. 33.)[6] The Court has reviewed these Declarations and finds they satisfy the injury in fact requirement.

Ron Mitchell is a member and Executive Director of Idaho Sporting Congress ("ISC") and also a member of the Alliance for the Wild Rockies. (Dkt. 33-4, Mitchell Dec.) The ISC is dedicated to protecting public lands and their natural resources. *Id.* Mr. Mitchell states he, and other members, have used and intend to continue using and enjoying lands in

---

[6] Plaintiffs also attached a Second Declaration of Ron Mitchell to its Reply brief. (Dkt. 41.) Intervenor Defendants argue the Second Declaration of Ron Mitchell is "too late" as it should have been filed with Plaintiffs' opening brief. (Dkt. 44 at 2-3.) The Court generally agrees that standing should be shown at the time a plaintiff makes his or her initial filing. The Intervenor Defendants, however, have not been prejudiced as they were able to respond to the Second Mitchell Declaration in their reply brief. Regardless, the Court has relied only on the Mr. Mitchell's first Declaration in deciding the standing issue.

the PNF and the Project Area since 1959 for hunting, fishing, nature study, and photographic pleasures. The Project's Activities, Mr. Mitchell states, will prevent him and the other members of the ISC's from using and enjoying the lands.

The Intervenor Defendants argue Mr. Mitchell's Declaration is not specific enough and too conclusory to satisfy the standing requirements; in particular as to his plans to recreate in the Project Area. (Dkt. 44 at 2.) The Court disagrees. Mr. Mitchell's first Declaration states he has visited the area since he was fourteen and has "concrete plans and firm intention to visit the Project Area in the summer of 2016 to fish and hike, and in the autumn of 2016..." and will continue to do so for many years to come. (Dkt. 33-4, Mitchell Dec. at 2.) This is sufficient to satisfy Article III standing for both ISC and the Alliance for the Wild Rockies; as Mr. Mitchell is a member of both organizations.

Michael Garrity's is the Executive Director and a member of the Alliance for the Wild Rockies which is an organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion. (Dkt. 33-2, Garrity Dec.) Mr. Garrity describes his interests in the area, as well as those of other members, and states he has "concrete plans and firm intention to visit the Project area in the Fall of 2017 and Fall of 2026" to use and enjoy the lands. (Dkt. 33-2, Garrity Dec. at ¶ 6.) Those interests will be harmed, he states, by allowing the Project's proposed activities to move forward without complying with the substantive and procedural protections guaranteed by the applicable statutes making up the claims in this case.

12

Similarly, Dr. Sara Jane Johnson's Declaration states that she is the Executive Director and a member of the Native Ecosystems Council which is dedicated to the protection and preservation of native wildlife and plant species of the Northern Rockies Bioregion. (Dkt. 33-3, Johnson Dec.) Dr. Johnson notes her specific participation and interest in the management of wildlife habitat and the impacts of logging on wildlife. Dr. Johnson states her planned 2015 visit to the LCBC Project Area failed but that she has plans and firm intention to make the visit in the summer of 2017 and again in the early 2020s. (Dkt. 33-3, Johnson Dec. at ¶ 4.) This Declaration lists the particular interests of the other members who use and enjoy the Project Area and claim the Project will harm those interests including the recreational, educational, and aesthetic interests with regard to the wildlife in the area and the old forest habitats.

The Court finds the Garrity and Johnson Declarations to be sufficient to show an injury in fact as to each of their organizations. The Defendants are alleged to have violated statutes designed to protect an individual's aesthetic enjoyment and recreational values of the forests such as those interests the Plaintiffs possess in the Project Area. Further, the interests claimed by each Declarant are concrete and particular to the Project Area. The Declarants' both aver that they have "concrete plans and a firm intention" to visit the Project Area in the future. Further, the Declarations show the injury alleged is actual or imminent given the Project's activities will negatively impact the Plaintiffs' interests in the area and lessen their ability to use and enjoy the Project Area. *See Friends of the Earth*, 528 U.S. at 183. The Court also finds these interests sought to be protected are within the zone

13

of interests of the statutes in question in this case.

### B.      Causation and Redressability

As to the remaining standing elements of causation and redressability, the Court finds both have been met here. Causation requires an analysis of whether the alleged injury is fairly traceable to the defendant, while determining redressability "requires an analysis of whether the court has the power to right or to prevent the claimed injury." *Barnum Timber Co. v. United States E.P.A.*, 633 F.3d 894, 899 (9th Cir. 2011). Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, "the causation and redressability requirements are relaxed." *Kraayenbrink*, 632 F.3d at 485; *Salmon Spawning*, 545 F.3d at 1226 (citing *Lujan*, 504 U.S. at 572 n. 7) ("A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility."). "Plaintiffs alleging procedural injury can often establish redressibility with little difficulty, because they need to show only that the relief requested─that the agency follow the correct procedures─may influence the agency's ultimate decision of whether to take or refrain from taking a certain action. This is not a high bar to meet." *Salmon Spawning*, 545 F.3d at 1226─27 (internal citation omitted). Nonetheless, "the redressibility requirement is not toothless in procedural injury cases." *Id*.

The Court finds that Plaintiffs' Declarations establish that the injury alleged is fairly traceable to the challenged action of the Defendants and it is likely that the injury will be redressed by a favorable decision. The Declarations each tie the alleged harm to the Project's proposed activities which, if Plaintiffs prevail in this case, would not occur.

14

Based on the foregoing, the Court concludes the Plaintiffs have standing.

**2**.      **Endangered Species Act Claim**

The first claim for relief alleges the Forest Service violated the ESA by failing to 1) ensure there is no adverse modification of the bull trout, a listed threatened species under the ESA, and its critical habitat and 2) consult and/or reinitiate consultation with the appropriate federal agency on actions that may affect the bull trout or its critical habitat. (Dkt. 25 at ¶¶ 87-91.) Specifically, Plaintiffs argue the Forest Service violated the ESA by failing to consult with the United States Fish and Wildlife Service ("FWS") on the bull trout critical habitat designation in the 2003 Payette Forest Plan. (Dkt. 41 at 25-26.) The Forest Service counters that it satisfied the ESA's consultation requirements, reinitiation of consultation is not required in this case, and the Plaintiffs have not shown an injunction is warranted. (Dkt. 36 at 28-30.) The Intervenor Defendants maintain the Forest Service's ESA consultation on bull trout was sufficient. (Dkt. 39 at 21-25.)

Congress enacted the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544, "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Section 7 of the ESA requires an agency to ensure that their discretionary actions will not "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a). The agency proposing an activity "shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat[s]." 50

C.F.R. § 402.14(a). This requires the agency to inquire with the relevant wildlife agency to determine whether any listed species or critical habitat are present in the proposed action area. *See* 16 U.S.C. § 1536(c)(1). If an endangered species may be present, a biological assessment ("BA") is prepared. *Id.* Where it is determined that a discretionary agency action "may affect" a listed species or critical habitat, the implementing agency has a duty under Section 7 of the ESA to consult, either formally or informally, with the appropriate expert wildlife agency. *See Karuk Tribe of Cal. v. United States Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). Formal consultation is required when the Forest Service has determined that an action is "likely to adversely affect" a listed species. *Id.* Formal consultation is not required if 1) the Forest Service finds, either in its biological assessment or through informal consultation, that while a project "may affect" a listed species, the species is "not likely to be adversely affected," and 2) the expert wildlife agency concurs in writing. 50 C.F.R. §§ 402.12(j)–(k), 402.13(a), 402.14(b)(1).

After the initial consultation process is complete, an agency has a duty to reinitiate formal consultation under certain circumstances, including where 1) "the amount or extent of taking specified in the incidental take statement is exceeded," 2) "if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or 3) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was

not considered in the biological opinion." 50 C.F.R. § 402.16.[7]

Generally, "the minimum threshold for an agency action to trigger consultation with the [Fish&] Wildlife Service is low." *Kraayenbrink*, 632 F.3d at 496; *see also Karuk Tribe*, 681 F.3d at 1027 ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character" triggers the requirement.) (citation and quotation omitted). "The consultation requirement reflects a 'conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies.'" *Id.* at 1020 (quoting *Tenn. Valley Auth.*, 437 U.S. at 185).

Plaintiffs argue the Forest Service is required to reinitiate consultation based on "new information" and the Ninth Circuit's decision in *Cottonwood Environmental Law Cntr. v. United States Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015). (Dkt. 33 at 29-32.) Defendants disagree with the *Cottonwood* decision and argue the Forest Service was not required to reinitiate consultation in this case. (Dkt. 36 at 29-33) (Dkt. 39 at 23-25.)[8]

---

[7] Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

|     |                                                                                                                                                      |
| --- | ---------------------------------------------------------------------------------------------------------------------------------------------------- |
| (a) | If the amount or extent of taking specified in the incidental take statement is exceeded;                                                             |
| (b) | If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; |
| (c) | If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or |
| (d) | If a new species is listed or critical habitat designated that may be affected by the identified action.                                              |

50 C.F.R. § 402.16

[8] The Forest Service has filed a Petition for Certiorari which is pending before the United States Supreme Court. *United States Forest Serv. v. Cottonwood Environ. Law Cntr.*, 789 F.3d 1075 (9th Cir. 2015), *petition for cert. filed*, (U.S. May 13, 2016) (No. 15-1387).

In *Cottonwood*, the Ninth Circuit held the ESA's requirement that the Forest Service reinitiate consultation continues to apply at the programmatic level even after a Forest Plan has been adopted because the Forest Service maintains discretionary involvement and/or control over implementing its own Forest Plans. *Id*. at 1084-88 ("the appropriate test is not whether the agency has completed its action, but whether it retains regulatory authority over the action.") (citation omitted). This Court finds the ruling in *Cottonwood*, in general, requires the Forest Service to comply with the ESA's regulation requiring reinitiation of consultation with regard to the 2003 Forest Plan. That being said, *Cottonwood* does not, in and of itself, require the Forest Service to reinitiate consultation in this case. ESA regulation 50 C.F.R. § 402.16 must first be triggered in order for the Forest Service to have been required to reinitiate consultation on the 2003 Forest Plan.

The parties here disagree over whether the ESA consultation requirements have been triggered. Plaintiffs argue the Forest Service was required to reinitiate consultation for the 2003 Forest Plan based on "new information" concerning bull trout. (Dkt. 41 at 25, 32.)[9] Defendants contend that the documents pointed to by Plaintiffs are not "new

---

[9] Plaintiffs clarify in their briefing that the ESA challenge here is as to the Forest Service's failure to reinitiate consultation for the 2003 Forest Plan, not the LCBC Project. (Dkt. 41 at 25, 32.) The Project level consultation in this case began in 2012 with informal consultation between the Forest Service and FWS. (FS009415.) On February 24, 2014, the Forest Service requested formal consultation from FWS under Section 7 of the ESA concerning the Project's impact on bull trout and its critical habitat. (FS009408-09.) In March of 2014, the Forest Service presented its BA concluding the Project is likely to adversely affect bull trout and its critical habitat. (FS009135, FS009408.) The BA used the nine PCEs to analyze the effects of the Project on the bull trout critical habitat. (FS009282.) The FWS reviewed the proposed action and, on May 1, 2014, issued a BiOp (2014 BiOp) that concluded "the proposed project will not jeopardize the survival and recovery of bull trout...or result in the destruction or adverse modification of bull trout designated critical habitat." (FS009408, FS009415.) The 2014 BiOp considered the nine PCEs (FS009465-66.) The Forest Service satisfied the ESA's consulting requirement at the project level.

information." (Dkt. 43 at 13.)

All five of the distinct population segments (DPS) of the bull trout species have been listed as a threatened species since November 1, 1999. (FS009444), 64 Fed. Reg. 58, 910 (Nov. 1, 1999). In 2002, the FWS proposed to designate critical habitat for two DPS of bull trout; including 307 miles of stream in the Little-Lower Salmon River subunit which is located in the Project Area. (FS009615), 67 Fed. Reg. 71,236, 71,281 (Nov. 29, 2002). The FWS's 2002 proposed critical habitat designation was contested in litigation and ultimately, in 2010, the FWS issued its Final Rule (2010 Final Rule) for critical habitat designation for all five bull trout populations which still included the designation of the Little-Lower Salmon River subunit. (FS009453) (FS021399-021572); 75 Fed. Reg. 63,898 (Oct. 18, 2010).

While the FWS's proposed critical habitat designation was being litigated, the PNF Forest Plan was under revision. The revisions to the Forest Plan included adoption of the long-term comprehensive Aquatic Conservation Strategy (ACS) comprised of eight components designed to provide short and long-term recovery of listed fish species. (FS00063-64, 000469.) During the Forest Plan revision, the Forest Service sought formal consultation from FWS on the potential effects of implementing the proposed revised Forest Plans on, as applicable here, bull trout. (FS009517.) On May 30, 2003, the FWS issued a BiOp (2003 BiOp) that concluded the proposed Forest Plan revision was "not likely to jeopardize the continued existence of bull trout and that its proposed critical habitat will not be destroyed or adversely modified." (FS009653.) In reaching that

19

conclusion, the FWS considered, among other things, the 2002 proposed critical habitat designations, the nine Primary Constituent Elements (PCE), and ACS. (FS009603-10, FS009615-16, FS009632, FS009650-51.) In July of 2003, the Forest Service issued its revised Forest Plan (2003 Forest Plan). Thereafter, the litigation over the FWS's critical habitat designation concluded and the 2010 Final Rule was issued.

Plaintiffs contend the 2010 Final Rule and a Report prepared in 2010 by Rodger L. Nelson (Nelson Report) are "new information" requiring the Defendants to reinitiate consultation of the 2003 Forest Plan concerning the bull trout. (Dkt. 41 at 29-31.) The Defendants argue the Forest Service's 2003 consultation on the Forest Plan revision evaluating the impacts of the 2002 proposed critical habitat designation satisfied the ESA's consultation requirement and neither the 2010 Final Rule nor the Nelson Report are "new information" requiring reinitiation of consultation. (Dkt. 36 at 29-30) (Dkt. 39 at 22) (Dkt. 43 at 17-18.) Plaintiffs maintain the 2010 Final Rule is different from the 2002 proposed critical habitat designation and, therefore, "new information." (Dkt. 41 at 27-30.) The Court finds the Forest Service was not required to reinitiate consultation on the 2003 Forest Plan.

Neither the 2010 Final Rule nor the Nelson Report are "new information" triggering the ESA's consultation requirement. Again, reinitiation of consultation is required where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16. The 2010 Final Rule defined and revised the language of the PCEs to address concerns from

20

peer reviewers, increased the amount of bull trout critical habitat designated, and made small adjustments to waterbody segments based on site-specific information received during the public comment period. (FS021426-28, FS021433-34.) Some of the 2002 proposed bull trout critical habitat designations were revised in the 2010 Final Rule, but a majority of the designations were the same as those originally proposed and consulted on in 2003. In particular to the Project Area here, the 2010 Final Rule retained the same designation for the Little-Lower Salmon River, in the Salmon River Basin Unit, as critical habitat. (FS021443.) The fact that there are some changes to particular designations between the 2002 proposal and the 2010 Final Rule does not demand reinitiating consultation. The substantive determinations needed to be considered and consulted on with regard to bull trout and its critical habitat were made when the 2003 Forest Plan was adopted. Notably, the 2010 Final Rule utilized the nine PCEs for bull trout, with slightly revised wording, that were included in the 2002 proposed critical habitat designation and considered/consulted on in the 2003 BiOp. (FS009615-16) (FS021475, FS021401, FS021402-03.) While wording may have changed, the substance of these discussions and the resulting analysis show that the 2003 Forest Plan had considered the same information that was used in the 2010 Final Rule. Having reviewed the materials, the Court concludes the 2010 Final Rule does not contain "new information" that was not previously considered.

Likewise, the Nelson Report is not "new information." The Nelson Report was prepared by fisheries biologist Rodger L. Nelson on March 16, 2010 for the purpose of

evaluating and responding to the FWS's critical habitat proposal for bull trout in the PNF. (FS021573-021635.) In that Report, the Forest Service considered the FWS's proposed critical habitat designations for bull trout in the PNF. (FS021575, FS021593, FS021616.)

The Plaintiffs argue the Nelson Report contains new information because it recognizes the importance of the specific streams and segments that are designated. (Dkt. 41 at 30.) There is no dispute that the particular designations vary slightly between the 2002 proposed critical habitat designation and the 2010 Final Rule. Defendants, however, maintain the differences do not rise to the level of "new information," the designations in the Project Area at issue in this case are the same, the Plaintiffs lack standing to bring a forest-wide challenge, and the Plaintiffs have not shown an injury justifying an injunction. (Dkt. 43 at 14-17.)

The Court finds the Nelson Report is not "new information" with regard to particular stream designations. Some of the Forest Service's disagreement with certain of the 2010 proposed designations relays back to concerns it expressed to the FWS in 2002. (FS0024862) (citing to Appendix 1, Madrid 2002.) The Court finds the Nelson Report's reference to the 2002 concerns is indicative of the fact that the information had been previously considered when the 2003 Forest Plan was issued and, therefore, is not "new information." While the Nelson Report goes on to make "more specific or detailed" suggested changes to the proposed designations, the concerns underlying the suggestions are same as those the Forest Service made and were considered when the 2003 Forest Plan was finalized. For instance, the Nelson Report's discussion of the impact brook trout have

on bull trout is a concern that had been previously considered and analyzed in the 2003 BiOp. (FS009632, FS009635, FS009655.)[10] For these reasons, the Court finds the Nelson Report is not "new information" as it does not contain materials not previously considered.

The Plaintiffs' Motion for Summary Judgment is denied and the Defendants' Motions for Summary Judgment are granted on the ESA claim.

## 3.     NEPA Claims

Plaintiffs argue the Forest Service violated NEPA by improperly tiering the LCBC FEIS and failing to take a hard look at the Project's potential impacts on wildlife and vegetation. (Dkt. 33, 41.)[11]

The National Environmental Policy Act ("NEPA") "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA is a procedural statute that "does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *San Diego Navy Broadway Complex Coalition v. United States Dept. of Def.*, 817 F.3d

---

[10] Appendix 1 to the Nelson Report contains the Forest Service's comments sent to FW in 2002 that also discusses the presence of brook trout in the PNF. (FS0024887.)

[11] The second through sixth claims for relief in the Second Amended Complaint raise NEPA challenges arguing the Forest Service: 1) failed to adequately disclose and analyze the environmental impacts of the Project; 2) improperly tiered a document that has not completed the NEPA process; 3) used an unreasonably narrow definition of purpose and need in its consideration of the range of alternatives; 4) failed to analyze an adequate range of alternatives; and 5) failed to adequately analyze mitigation measures. (Dkt. 25 at ¶¶ 92-131.) Defendants argue the Plaintiffs have waived the second, fourth, fifth, and sixth claims by failing to address those claims in their Motion for Summary Judgment. (Dkt. 36 at 17 n. 6) (Dkt. 39 at 15) (Dkt. 44 at 4.) In this Order, the Court has addressed those claims which the parties have argued in their cross-motions for summary judgment. Those claims not raised and/or argued here on summary judgment have been abandoned. *See Desert Protective Council v. United States Dept. of the Interior*, 927 F.Supp.2d 949, 977 (S.D. Cal. Feb. 27, 2013) (citing cases).

653, 659 (9th Cir. 2016) (quoting *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 814 (9th Cir.1999)) (internal quotation marks omitted). NEPA exists "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2004). "NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *Pac. Coast Fed. of Fishermen's Assn. v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012); *see also* 42 U.S.C. § 4332. The purpose of NEPA is: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council*, 395 F.3d at 1027 (citation omitted). The "hard look" NEPA demands requires the agency to provide "a reasonably thorough discussion" of the probable, significant environmental consequences of the proposed action. *Nat. Parks & Conservation Assn. v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

### A.    Tiering

Plaintiffs claim the LCBC FEIS is improperly tiered to a 2011 Draft Environmental Impact Statement proposing amendments to the 2003 Forest Plan. (Dkt. 33 at 18-27.) Defendants maintain the LCBC FEIS is not tiered to any other environmental analysis

(Dkt. 36 at 22-25) (Dkt. 39 at 20.)

"Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28. NEPA regulations encourage agencies to "tier" their environmental impact statements in some situations because tiering often enables agencies "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. For instance, where an agency is moving from a broad "program, plan, or policy environmental impact statement to ... a site-specific statement or analysis," 40 C.F.R. § 1508.28(a), tiering is appropriate. *See 'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006). However, the Forest Service cannot tier its analysis to a forthcoming, uncompleted NEPA document. *See Kern v. United States Bureau of Land Mngmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) (explaining that "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."). Unlawful tiering occurs when a NEPA document refers to a more general non-NEPA document in order to explain and evaluate the environmental impact of the decision in question. *League of Wilderness Defenders v. United States Forest Serv.*, 549 F.3d 1211, 1218-20 (9th Cir. 2008).

In 2011, the Forest Service released a Draft Environmental Impact Statement proposing amendments to the 2003 Forest Plan (WCS DEIS) which includes adopting the Wildlife Conservation Strategy (WCS or WCS Amendments). (FS000620, FS077794.) The WCS prioritizes the types of activities that should be undertaken to help maintain and restore habitat for wildlife species in greatest need of conservation. The theory underling the WCS is that restoration of historic vegetative conditions and emulation of their inherent disturbance process would conserve the vast majority of the species that have seen their habitats decline geographically. (FS077794, FS078082-84.) The WCS DEIS has not, however, completed the NEPA process nor been adopted into the Forest Plan. (FS080341-42.)

In the LCBC FEIS, the Forest Service considered and relied upon some of the mid-scale assessments, analysis, and science utilized during the preparation of the WCS DEIS. (FS077794, FS078084.) For instance, in defining the Project's purposes and needs relating to restoration of vegetation and subwatersheds to desired conditions, the LCBC FEIS refers to the WCS DEIS. (FS077797.) To determine changes in wildlife habitat for species of concern, the LCBC FEIS states it employed habitat models designed for the WCS DEIS utilizing data, models, records, and field reviews from other sources. (FS078077.) The Court finds this use of the science underlying the WCS DEIS is not tiering because the Forest Service explained its reasoning and identified the basis underlying its analysis which utilized the science in the WCS DEIS as well as other sources.

Plaintiffs point in particular to the FEIS's recommendation that Management Prescription Category (MPC) 5.1 be applied in all MPC 5.2 designated areas as proposed in the WCS Amendments. (Dkt. 41 at 22-23.) The desired conditions discussion in the LCBC FEIS "incorporates the science and updated data" from the WCS DEIS but recognizes that discrepancies exist between the desired conditions and the science used in the 2003 Forest Plan as compared to the WCS DEIS. (FS077902.) The FEIS notes the WCS's proposal is to convert all MPC 5.2 lands to MPC 5.1 and then states the analysis for the LCBC Project will also utilize desired conditions for MPC 5.1 in the Project Area. Defendants maintain this language from the LCBC FEIS does not "incorporate by reference" the WCS DEIS but, instead, refers to the science and data in the administrative record that was used in the LCBC FEIS for this Project. (Dkt. 43 at 11-12.) The Court finds the "incorporation" language in the LCBC FEIS is, at the very least, confusing and, at worst, misleading. (FS077902.) When reading that passage in conjunction with the several citations and references to the WCS DEIS, at first glance, makes it appear as if the LCBC FEIS has improperly tiered to the WCS DEIS. However, in reviewing the materials in the Administrative Record that the LCBC FEIS cites to when making reference to the WCS DEIS, the Court concludes there was no tiering. The Forest Service clearly used the same science underlying the WCS DEIS, as well as other more recent research and resources, in making the determinations and recommendations in the LCBC FEIS. (FS080341-42.) That, however, does not amount to tiering.

"Tiering refers to the process whereby an agency is allowed to reference an earlier

27

agency decision or policy when assessing the environmental impacts of a smaller project under NEPA without going into a full-blown discussion of the earlier decision." *Native Ecosystems Council & Alliance for the Wild Rockies v. United States Forest Serv.*, 866 F.Supp.2d 1209, 1227 (D. Idaho 2012) (quoting 40 C.F.R. § 1502.20). Because the WCS DEIS has not gone through the full NEPA process, the Forest Service cannot simply refer/rely upon it to avoid fully discussing its analysis and the impacts of the Project. *See Kern*, 284 F.3d at 1173 ("tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."); (FS080342.).

The Court finds the Forest Service has not improperly tiered in this case. The Forest Service relied on and considered the science used in the WCS DEIS for the LCBC FEIS but it does not merely refer to the WCS DEIS for its conclusions. Instead, the LCBC FEIS discusses the Forest Service's analysis and reasoning underlying the recommendations and conclusions reached for this Project based on the science used in the WCS DEIS as well as other science contained in the Administrative Record.

**B.    Hard Look**

At the core of Plaintiffs' NEPA claims is their disagreement with the WCS Amendments proposed for the Forest Plan and, to the extent it shares the same reasoning and conclusions, the LCBC FEIS's incorporation of the WCS Amendments into the LCBC Project.[12] Plaintiffs argue the Project is not the "restoration" of desired conditions but is

---

[12] To the extent the Plaintiffs are challenging the WCS Amendments and/or the WCS DEIS, those matters are beyond the scope of this case.

instead implementing the WCS Amendments that have not been adopted or formally made a part of the Forest Plan. (Dkt. 33 at 24-27.) In particular, Plaintiffs challenge the LCBC FEIS's reliance on the WCS Amendments concerning wildlife and vegetation impacts; specifically, the WCS's proposal to utilize the desired conditions identification for vegetation areas defined as MPC 5.2 be converted to MPC 5.1. (Dkt. 33 at 22-27) (FS077902, FS077934.) In this regard, Plaintiffs' NEPA claims allege the Forest Service failed to take the requisite hard look at the Project's potential impacts on vegetation and wildlife. (Dkt. 33 at 27-28.) This argument tracks the Plaintiffs' tiering arguments asserting that the Forest Service's analysis in the LCBC FEIS is improperly based on the assumption that the WCS Amendments will be implemented into the Forest Plan. Defendants maintain the Forest Service took a hard look at the Project and adequately analyzed and disclosed the potential environmental consequences of the Project. (Dkt. 36 at 26-28) (Dkt. 44 at 8.)

Having reviewed the LCBC FEIS and the entire Administrative Record, the Court finds the Forest Service took the requisite hard look at the Project's potential impacts on vegetation and wildlife. (FS077901-34, FS078082, FS078090-078125.) In particular, the LCBC FEIS analyzed and discussed the Forest Service's reasoning for concluding the desired conditions for MPC 5.1 should be used instead of those for MPC 5.2. (FS077902-04, FS077913-35, FS080343.) The Forest Service's reasoning, scientific basis, and conclusions concerning restoration to historic conditions are also discussed in the LCBC FEIS. (FS052862) (FS077791-94, FS077902-03, FS077942-46, FS078087.) These scientific determinations and technical analysis are afforded the "highest deference."

*League of Wilderness Defenders*, 615 F.3d at 1131; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).

The Forest Service has identified the science it considered, explained its reasoning, and arrived at a rational decision based on the facts found and the choice made. *Motor Vehicle*, 463 U.S. at 43. For these reasons, the Court finds the Forest Service took a hard look at the Project and its decision is not arbitrary or capricious. The Plaintiffs' Motion for Summary Judgment is denied and the Defendants' Motions for Summary Judgment as to the NEPA claims are granted.

**3.     NFMA Claims**

Plaintiffs argue the Forest Service's approval of the LCBC Project violates NFMA because the Project is inconsistent with the PNF Forest Plan and failed to properly designate the minimum road system in accordance with the Travel Management Rule. (Dkt. 33, 41.)[13]

**A.     Consistency with NFMA and the Forest Plan**

---

[13]  The seventh, eighth, and ninth claims for relief in the Second Amended Complaint allege the Forest Service violated NFMA by: 1) failing to comply with the Payette National Forest Plan; 2) failing to comply with the diversity requirement; and 3) failing to properly designate the minimum road system in accordance with the Travel Management Rule. (Dkt. 25 at ¶¶ 132-150.) Defendants argue the Plaintiffs have waived the eighth claim – failure to comply with diversity requirement of NFMA - by failing to address that claim in their Motion for Summary Judgment. (Dkt. 36 at 17 n. 6) (Dkt. 39 at 15) (Dkt. 44 at 4.) In this Order, the Court has addressed those claims which the parties have argued in their cross-motions for summary judgment. Those claims not raised and/or argued here on summary judgment have been abandoned. *See Desert Protective Council*, 927 F.Supp.2d at 977.

Plaintiffs' consistency claims echoes their NEPA arguments concerning the proposed WCS Amendments. Plaintiffs assert the Project violates NFMA because it has been approved based on the standards, criteria, and guidelines set forth in the WCS Amendments which have not been adopted into the Forest Plan. (Dkt. 33 at 13.) The Plaintiffs again challenge the Project's treatment of the MPC 5.2 lands as MPC 5.1 lands as well as the use of the WCS's old forest habitat criteria. (Dkt. 41 at 7.) Because the WCS's proposed modifications have not been adopted into the Forest Plan, Plaintiffs assert, they are inconsistent with the Forest Plan and the Forest Service's approval of the Project implementing the WCS's proposals is also inconsistent with the Forest Plan and in violation of NFMA. Defendants maintain the Project is consistent with NFMA and the Forest Plan. (Dkt. 36 at 18) (Dkt. 39 at 16.)[14]

NFMA imposes both procedural and substantive requirements for the management of National Forest lands. *See* 16 U.S.C. §§ 1600 *et seq*. "NFMA requires the Forest Service to develop comprehensive management plans for each unit of the National Forest System, 16 U.S.C. § 1604(a), and all subsequent agency action must be consistent with the governing forest plan § 1604(i)." *Greater Yellowstone v. Lewis*, 628 F.3d 1143, 1149 (9th

---

[14] The Forest Service argues the Plaintiffs failed to raise/exhaust their inconsistency claim – in particular that Plaintiffs never objected to the Forest Service's emphasis on restoration for desired future conditions for vegetation, as opposed to commodity production, as violating NFMA – during the administrative process and, therefore, cannot raise it here for the first time on summary judgment. (Dkt. 36 at 19) (Dkt. 43 at 1-5.) Plaintiffs maintain their comment/objection letters provided during the administrative process provided sufficient notice to alert the Forest Service to their arguments concerning the use of MPC 5.1 standards and old forest habitat criteria in the Project Area and afford it an opportunity to address/rectify any violations. (Dkt. 41 at 5-12.) In reviewing the Administrative Record, the Court finds the Forest Service had some notice with regard to the Plaintiffs' NFMA consistency claim and the claim was exhausted. (FS077016, FS080341-45, FS080408-09, FS080433-35, FS080444.)

Cir. 2010); *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300

(9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i))).

> The NFMA sets forth the statutory framework and specifies the procedural
> and substantive requirements under which the Forest Service is to manage
> National Forest System lands. Procedurally, the NFMA requires the Forest
> Service to develop a forest plan for each unit of the National Forest System.
> 16 U.S.C. § 1604(a). In developing and maintaining each plan, the Forest
> Service is required to use a systematic interdisciplinary approach to achieve
> integrated consideration of physical, biological, economic, and other
> sciences. § 1604(b). After a forest plan is developed, all subsequent agency
> action, including site-specific plans ... must comply with the NFMA and be
> consistent with the governing forest plan. § 1604(i).

*Id.* (citation omitted). "Forest Plans are broad, long-term programmatic planning

documents for an entire National Forest. Forest Plans establish goals and objectives for

individual units of the National Forest System and provide specific standards and

guidelines for management of forest resources, ensuring consideration of both economic

and environmental factors." *League of Wilderness Defenders-Blue Mtns. Biodiversity

Prjct. v. Smith*, No. 04-1595-KI, 2004 WL 2847877, *3 (D.Or. Dec. 9, 2004) (citing 16

U.S.C. 1604(g)(1)-(3); 36 C.F.R. § 219.1, 219.4(b)(3)).

### 1.    Utilization of Desired Conditions MPC 5.1 in MPC 5.2 Areas

The 2003 Forest Plan defines the programmatic management strategy for the PNF.

(FS000013.) It does not implement any specific actions or projects but, instead, sets the

stage for, as relevant here, 1) the type of activities that are allowed or not allowed to best

address management strategies and related MPC emphasis and direction and 2) as well as

the intensity, duration and limitations on management actions needed to manage risks and

threats to resources and the social and economic environment, while maintaining or moving toward achievement of desired conditions. (FS000013.)

The 2003 Forest Plan uses five types of forest-wide management direction for resource programs: desired conditions, goals, objectives, standards, and guidelines. (FS000091-92.) Only standards have binding limitations placed on management actions which, except for in certain cases, require amendment to the Forest Plan before an action varying from the standard can be approved. (FS000092.) Where a proposed action will deviate from a guideline, the rationale for such deviation must be documented in the project decision document. The Forest Plan broadly defines the forest-wide desired conditions common to all resources and then more specifically to particular resources. (FS000095.) The resource in question in this case is vegetation, or more specifically, forested vegetation. (FS000118.)

The 2003 Forest Plan then gives direction on a Management Area level; dividing the forest into smaller units to provide descriptions and direction that address more specific concerns to a particular area. (FS000167.) Much of the Management Area direction uses objectives to be implemented at this level in order to achieve forest-wide goals and desired conditions. (FS000169.) While the forest-wide standards and guidelines generally apply to all Management Areas in the forest they may, however, be refined or expanded at the Management Area level to address specific concerns unique to that Management Area such as: 1) more explicit protection or guidance to the site-specific area than is provided in the forest-wide direction and 2) application of the standards and guidelines relating to MPC

33

found within a Management Area. (FS000169-70.)

The LCBC Project Area contains three Management Areas: MA-3 (Wiser River); MA-4 (Rapid River); and MA-5 (Middle Salmon River). (FS077792.) These Management Areas have been assigned MPCs as shown on each Management Area's Location Map and summarized in corresponding tables. At issue here are the MPC 5.1 and MPC 5.2 areas. The management direction for these areas include particular standards and guidelines for each MPC. (FS000218, FS000228, FS000242.) MPC 5.1 has a restoration emphasis with objectives of managing the forest within the historic range of variability which, for the Project Area, is a more open forest condition with heterogeneous structure and more large trees. (FS000176.) MPC 5.2 has a commodity production emphasis with the objective of growing stands with higher densities of smaller/younger more vigorous trees thereby increasing the amount of timber volume. (FS000176.) Appendix A to the Forest Plan then further describes the desired conditions for forested vegetation outside of designated wilderness areas. (FS000390.)

The Forest Service's decision to use the desired conditions for MPC 5.1 in the Project Area is consistent with the Forest Plan. (FS077902-03, FS077934-35, FS080343.) [15] The Forest Plan allows management consideration of "tradeoffs" for

---

[15] Plaintiffs argue the FEIS violates the Forest Plan and is improperly implementing the WCS Amendments by applying MPC 5.1 and Timber Standard 0509 to the current MPC 5.2 lands "in order to incorporate the science of the WCS DEIS." (Dkt. 41 at 14.) The Court disagrees. The FEIS has not "implemented" the WCS Amendments but has instead relied on the science underlying the WCS DEIS in reaching its recommendation that MPC 5.1 and Timber Standard 0509 be applied to the current MPC 5.2 lands. For reasons stated in this Order, this recommendation is consistent with the Forest Plan and, therefore, not in violation of NFMA.

project-scale analysis in order to achieve the desired vegetative conditions. (FS000120.)

Specifically, Guideline VEGU01 of the Forest Plan states:

> During site/project-scale analysis, tradeoffs in the achievement of one or
> more of the vegetative components described in Appendix A may need to be
> considered. Current conditions of the vegetation may necessitate the need to
> move one component away from the desired condition in order to move
> another one toward the desired condition. In these situations, decisions
> should be based not only on which vegetative component is important to
> emphasize at any point in time to meet resource objectives, but also how to
> effectively move all components toward their desired condition over the long
> term.

(FS000120.) Appendix A to the Forest Plan describes the desired conditions for vegetation

outside of designated wilderness areas which also contemplates modifications on a project

level basis, stating:

> Desired conditions do not represent static state; they are dynamic because the
> ecosystems we are working with are dynamic. The desired conditions are not
> something that every acre of the Forest at every point in time will possess –
> there will always be spatial and temporal variability.
> ...
> In many areas our current conditions deviate strongly from our desired
> conditions this deviation creates opportunities for managing vegetation.
> Even under careful management, though, it may take several decades for
> these areas to approach desired conditions, and there are steps along that path
> where managers will have to choose among several approaches to maintain
> or trend toward desired conditions. There may be many different paths to
> common endpoint that meet different management objectives, each with
> their own set of trade-offs. This will be the challenge of ecosystem
> management in managing vegetation and trying to achieve desired vegetative
> conditions. As we move forward in this process, and we learn more from
> monitoring and scientific research, our desired conditions may change, or we
> may alter the paths we choose to achieve them. For these reasons, it is not
> possible to describe completely prescriptive approach to desired conditions,
> but merely offer guidance in how to consider desired conditions.
> ...
> The desired conditions are general conditions that can be modified at the

local or project level based on site-specific biophysical conditions.

(FS000390.)

Based on this direction from the Forest Plan, the Court finds the Forest Service's decision to apply the desired conditions for MPC 5.1 to MPC 5.2 areas in the Project in order to achieve the restoration goal of moving the vegetation toward the desired conditions is not arbitrary or capricious. (FS077902, FS000176.) MPCs are not Forest Plan standards. MPCs are "broad categories of management prescriptions that include the general management emphasis prescribed for a given area." (FS000170.) No amendment to the Forest Plan is required in order for a project to deviate from an assigned MPC. The Forest Plan allows forest managers a certain degree of flexibility and discretion when designing activities and projects to adjust certain variables in order to achieve the goal of maintaining or moving towards the overarching desired conditions for the forest. In this case, the Forest Service determined that, based on the most current science, the site-specific conditions in the Project Area should be adjusted to apply the desired conditions for MPC 5.1 to the MPC 5.2 lands in order to achieve the desired future conditions. (FS077794, FS077902.)

The Court finds this decision is not arbitrary or capricious and is consistent with the Forest Plan. The Forest Service identified the science underlying its decision, explained its reasoning, and made a rational and reasonable decision. Furthermore, the Forest Plan allows the Forest Service, as managers of the forest, the ability to make this decision so long as they consider all of the relevant factors, apply the best science, and explain the

36

reasoning for their decision. The Forest Service has done so here by articulating a reasonable basis for its decision based on the best science that is consistent with the Forest Plan. Therefore, regardless of whether this Court or the Plaintiffs agree with the decision, the Forest Service has not violated NFMA. *River Runners*, 593 F.3d at 1070 (The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action.").

### 2.   Use of Old Forest or Old Forest Habitat Criteria Definition

Plaintiffs also argue the Project's use of the old forest habitat criteria from Appendix E of the WCS Amendments is inconsistent with the Forest Plan. (Dkt. 33 at 13) (Dkt. 41 at 17.) Defendants maintain the LCBC FEIS applied the "old forest" characteristics as defined in the 2003 Forest Plan, not the WCS Amendments. (Dkt. 36 at 25 n. 12) (Dkt. 43 at 9-10.) Regardless of which definition is used, the Defendants argue the definitions are "virtually identical." (Dkt. 43 at 9 n. 4.) Plaintiffs dispute the Defendants' contention and argue the Project is not simply relying on the WCS's scientific analysis but, instead, is actually implementing the proposed WCS Amendments which are inconsistent with the Forest Plan. (Dkt. 41 at 17.)

Plaintiffs point out that Appendix E of the Forest Plan is significantly different from the WCS's proposed Appendix E. (Dkt. 41 at 17-18.) The Court has compared the two and agrees that they are different. (FS001328-67) (FS000509-20.) In particular, Appendix E of the WCS Amendments proposes adopting the use of the term "old-forest habitat" instead of "old forest" as is used in the current Forest Plan. (FS001354-55) (concluding that

"old-forest habitat" "better represents the desired habitat condition for those species of conservation concern than old growth" because each forest type is unique and "old growth," as defined, is historically rare in central Idaho given the frequency of fire disturbance in the area).[16] The Court has also compared the definitions of these terms contained in the Forest Plan and the WCS DEIS. The Forest Plan defines old forest as:

> **old forest**
> Old forest is component of the Large Tree Size Class with the following general characteristics: a variability in tree size that includes old, large trees with signs of decadence, increasing numbers of snags and coarse woody debris, canopy gaps, and understory patchiness. There are two broad types of old forest in the Southwest Idaho Ecogroup area - single-storied and multi-storied. Single-storied old forest is characterized by single canopy layer of large or old trees. These stands generally consist of widely spaced, shade-intolerant species, such as ponderosa pine and western larch, that are adapted to nonlethal, high frequency fire regime. Multi-storied old forest is characterized by two or more canopy layers, with large or old trees in the upper canopy. These stands can include both shade-tolerant and shade-intolerant species, and are typically adapted to mixed regime of both lethal and nonlethal fires. Because old forest characteristics have been aggregated into two basic categories, it is generally easier to identify, monitor, and compare the characteristics of these old forest types with desired vegetative conditions than it is with "old growth" (see old growth definition, below).

(FS000587.)

The WCS Amendments propose the following definitions:

> **old forest**
> Old forest is component of the Large Tree Size Class, with the following general characteristics: variability in tree size that includes old, large trees

---

[16] Plaintiffs argue adopting the "old forest habitat criteria" used in the WCS will result in the loss of existing old growth forest and paves the way for more logging in a manner inconsistent with the Forest Plan. (Dkt. 33 at 13-14.) Again, the Plaintiffs' challenges to the WCS Amendments themselves, i.e. whether "old growth" should be replaced by "old forest habitat," are not before the Court in this case. The NFMA question presented here is whether or not the LCBC FEIS is consistent with the Forest Plan.

with signs of decadence, increasing numbers of snags and coarse woody debris, canopy gaps, and understory patchiness. There are two broad types of old forest - single-storied and multi-storied. Single-storied old forest is characterized by single canopy layer of large or old trees. These stands generally consist of widely spaced, shade-intolerant species, such as ponderosa pine and western larch, that are adapted to nonlethal, high frequency fire regime. Multi-storied old forest is characterized by two or more canopy layers, with large or old trees in the upper canopy. These stands can include both shade-tolerant and shade-intolerant species, and are typically adapted to mixed regime of both lethal and nonlethal fires. Because old forest characteristics have been aggregated into two basic categories, it is generally easier to identify, monitor, and compare the characteristics of these old forest types with desired vegetative conditions than it is with "old growth" (see old growth definition below).

**old forest habitat**
See old forest

(FS001082-83.)

While these definitions are nearly the same, there are important differences between the use of these terms in the Forest Plan and the WCS DEIS. Central to Plaintiffs' argument here is that the term "old forest habitat" is contained only in the proposed WCS Amendments, not in the Forest Plan. (FS008582.) The Forest Service recognizes there are "varying opinions as to whether the *old forest criteria*…are appropriate for use on the Forest or if there is better/more applicable criteria available." (FS008582.) Because these important differences exist, the Court has carefully considered whether the LCBC FEIS effectively implements the WCS Amendments before they have been adopted into the Forest Plan. The Court concludes that the FEIS does not "implement" the WCS proposed amendments to the Forest Plan. While the FEIS clearly used and heavily relied on the science underlying the WCS DEIS, the LCBC FEIS applied that science, as well as other

sources, to the current Forest Plan.

The Forest Service's Forested Vegetation Specialist Report specifically states "[t]his project has been designated to maintain and promote *old forest* components identified in the Forest Plan, such as large tree structure, early seral legacy trees, snags, and [coarse woody debris]." (FS008582.) This Report further represents that "this project has not specifically incorporated the *old forest habitat* criteria as desired conditions…." (FS008582.) The Forest Service's use of the Forest Plan is evident, for example, in the FEIS's chapter discussing the propose alternatives contains Table 2-6 which lists the Project's Design Features/Mitigation Measures for Legacy Tree/Old Forest wherein it proposes to "[r]etain forest stands that meet the definition of old forest as defined in the Forest Plan, Appendix A." (FS077891.) The same table and language is included in the ROD. (FS078934.)

Plaintiffs, however, point to the LCBC FEIS's use of the old forest and snags, patch size and distribution described in Appendix E of the WCS DEIS to measure quality of restored habitat for the norther Idaho ground squirrel to show the FEIS implements the WCS Amendments. (FS077799.) The Court finds this use of the distribution described in Appendix E of the WCS DEIS to measure quality of habitat is not inconsistent with the Forest Plan. It is instead another instance of the LCBC FEIS utilizing the more recent data contained in the WCS DEIS and applying that data to the Forest Plan requirements.

Plaintiffs argue the Forest Service has also implemented the WCS DEIS in the FEIS's discussion of old forest habitat as it pertains to wildlife. (Dkt. 41 at 17.) The FEIS's

affected environment section pertaining to wildlife discusses the importance of old forest habitat to many terrestrial wildlife species. (FS078087-88.) In this section, the FEIS cites to the Forest Plan, the WCS DEIS, and other sources. In particular, The FEIS refers to the WCS DEIS for "more detailed discussion of old-forest characteristics and management concerns" and points to Appendix E of the WCS DEIS for "background information [] distinguishing between old forest and old growth." (FS078087.) The Court finds is section of the LCBC FEIS does not implement the WCS DEIS. As it did in the tiering arguments, the Court concludes the Forest Service has not improperly relied on or implemented the WCS DEIS. Instead, the old forest discussion in the FEIS applies the science underlying the WCS DEIS and other sources to the Forest Plan's definition. (FS078087) (citing to the Forest Plan, WCS DEIS, and other sources.)

The Court is, however, troubled by the FEIS's statement that: "[c]urrently, no stands have been identified in the project area that meet all attributes that characterize *old forest habitat* as defined in proposed Forest Plan amendments." (FS078087) (emphasis in original.) Since the term "old forest habitat" is found only in the WCS Amendments, not the Forest Plan, this conclusion applying the WCS DEIS's definition of "old forest habitat" seems to either be improper tiering or inconsistent with the Forest Plan. After reviewing the Forest Plan, WCS DEIS, and the LCBC FEIS, however, the Court concludes that the LCBC FEIS applied the definition of old forest from the 2003 Forest Plan. The statement quoted above is contained in the FEIS's general discussion of the importance of old forest habitat components on wildlife. (FS078087.) The statement originated in the Forested

41

Vegetation Specialist Report which provides further clarification of the terminology and represents that the LCBC FEIS uses the term "old forest" from the Forest Plan. (FS008582.) When considering the LCBC FEIS in its entirety, the Court finds the Forest Service applied definitions found in the Forest Plan.

For these reasons, the Court concludes the LCBC FEIS is consistent with the Forest Plan and, therefore, has not violated NFMA.

**B.      Travel Management Rule**

Plaintiffs argue the Forest Service's designation of the minimum road system violates § 212.5(b)(1) of the Travel Management Rule (TMR). (Dkt. 33 at 32-40) (Dkt. 41 at 32-38.) Subpart A of the TMR, 36 C.F.R. §§ 212.1-261.55, requires the Forest Service to determine, for each National Forest, the "minimum road system needed for safe and efficient travel and for utilization, and protection of National Forest System lands." 36 C.F.R. § 212.5(b)(1). The Minimum Road System (MRS) is:

> the road system determined to be needed to meet resource and other management objectives adopted in the relevant land and resource management plan...to meet applicable statutory and regulatory requirements, to reflect long-term funding expectations, [and] to ensure that the identified system minimizes adverse environmental impacts associated with road construction, reconstruction, decommissioning, and maintenance.

*Id.* This system is the minimum that will serve "forest health, emergency access, and public access needs," and that the system must "compl[y] with resource objectives,...reflect likely funding, and...minimize adverse environmental effects associated with road construction, reconstruction, and maintenance." 66 Fed. Reg. at 3208, 3207. This determination must be

based on "a science-based roads analysis at the appropriate scale." 36 C.F.R. § 212.5(b)(2).

Under NFMA, the Forest Service is required to ensure that all agency actions are consistent

with the governing Land and Resource Management Plan, here the PNF Forest Plan. *Wild*

*Wilderness v. Allen*, 12 F.Supp.3d 1309, 1314 (D.Or. April 14, 2014) (citing 16 U.S.C. §

1604(i); *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 961 (9th

Cir. 2005)).

Plaintiffs contend the Forest Service's selection of Alternative B violates

§ 212.5(b)(1) because that decision fails to ensure the adverse environmental impacts of

roads are being minimized and the MRS does not reflect long-term sources of funding.

(Dkt. 41 at 32-38.) In particular, the Plaintiffs argue Alternative C proposes a lower MRS

of 340 miles than the selected Alternative B, which has an MRS of 401 miles of roads, and,

Plaintiffs argue, Alternative C would have a smaller adverse environmental impact related

to roads. (Dkt. 41 at 32-33.) Defendants counter that § 212.5(b)(1) requires the Forest

Service to consider a number of factors, only one of which is the amount of MRS mileage,

and maintain the Forest Service's decision in this case considered each of those factors

consistent with the TMR. (Dkt. 43 at 20-22) (Dkt. 44 at 13.) The Court finds the Forest

Service did not violate the TMR.

The New Meadows Ranger District completed a Travel Analysis Process (TAP) for

the LCBC Project on January 8, 2013. (FS077796, FS010741.) The LCBC FEIS used the

TAP and other data to identify the MRS resulting from each of the action alternatives.

(FS077796.) In particular as to Alternative B, the LCBC FEIS discusses the proposed

system road decommissioning – approximately 68 miles of currently closed Forest system road and 90 miles of unauthorized route within the Project Area; the unauthorized route treatments; road relocation and re-routes; and road maintenance and travel management. (FS077833-36.) The FEIS also discusses the direct and indirect effects of the alternatives on watershed restoration with regard to each alternatives' proposed road decommissioning, density, and proposed MRS. (FS077997-99.) The FEIS considered the transportation needs in the Project Area in relation to public and resource management, the effect of roads on other resources, and then selected the alternative consistent with the desired condition direction set forth in the Forest Plan. (FS078217-26.) The Forest Service considered the TAP as well as the FEIS's discussions concerning the relevant MRS considerations in making its MRS recommendations and ultimately selected Alternative B-modified for the Project, which identifies a MRS of 401 miles that will apply to the Project Area. (FS077796, FS077808, FS077833-36, FS077959-60, FS078858, FS078900.)

Alternative C, pointed to by Plaintiffs, was developed to respond to comments that requested a more effective watershed restoration effort and address elk security and other wildlife concerns. (FS078253.) The FEIS recognizes that Alternative C would have the most benefit to certain resources including soil, watershed, riparian, and aquatic resources due to its increased level of watershed restoration through road decommissioning and long-term closure treatments. (FS077999, FS078914.) Alternative C is not, however, as effective as Alternative B at meeting the other considerations of financial efficiency, economic/employment, or wildfire suppression and the impacts of those factors on the

44

Project Area. (FS078253-54.) Ultimately, the Forest Service did not select Alternative C because the combination of less intensive vegetative treatments and fewer acres proposed for treatment makes it the least beneficial action for tree size class and would leave portions of the Project Area more susceptible and less resilient to insects and wildfire. (FS078906.)

The Forest Service instead selected Alternative B as it "best meets the projects objectives while remaining sensitive to the issues and concerns identified in the FEIS." (FS078884.) The Forest Service concludes Alternative B will achieve the Project's stated purposes relating to watershed improvement and restoration treatments; moving all subwatersheds toward desired conditions and reducing road-related impacts; and retaining an MRS sufficient for current and future use, access, and management activities. (FS078868-73, FS078890-94, FS078900.)

The Court finds the Forest Service's decision selecting Alternative B and identifying a MRS of 401 miles is not arbitrary or capricious and does not violate the TMR. The aforementioned record shows that the Forest Service considered the factors set forth in § 212.5(b)(1) when it designated the MRS for the Project. The LCBC FEIS and ROD both detail the basis for the Forest Service's decision which this Court finds is fully informed, reasonable, and entitled to deference. *Nw. Ecosystem Alliance v. United States Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

Further, the Court finds the Forest Service has considered the long-term sources of funding in designating the MRS. The FEIS described the four levels of road maintenance costs for both annual and deferred types of maintenance, provided a breakdown of the

annual costs by alternative, and identified the various sources of funding for road maintenance. (FS078225-26.) The Forest Service reasonably concludes that reduction of road miles generally reduces maintenance costs and is reflective of long-term funding expectations. The Forest Service's application and interpretation of its own regulation afforded deference. *See Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003). The Court finds the Forest Service's reasoning and conclusion are not arbitrary or capricious. The Forest Service "articulated a rational connection between the facts found and the choice made." *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of the Navy*, 898 F.2d 1410, 1414 (1990) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). That reducing the miles of roads in the Project Area will reduce maintenance costs is an entirely reasonable conclusion.

Based on the foregoing the Court concludes the Forest Service did not violate the TMR. Therefore, the Plaintiffs' Motion for Summary Judgment is denied and the Defendants' Motions for Summary Judgment are granted on this claim.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)   Plaintiffs' Motion for Summary Judgment (Dkt. 33) is **DENIED**.

2)   Defendants' Motions for Summary Judgment (Dkt. 36, 38) are **GRANTED**.

Dated: **August 31, 2016**

Honorable Edward J. Lodge
United States District Judge

46